| WOODARD, Judge.
This is a defamation suit. The defendant appeals from the trial court’s judgment that the plaintiff was defamed as a result of an article that the defendant published.

FACTS

The defendant, Jennifer Palmer, a vocational rehabilitation counselor, is a member of the Louisiana Association of Rehabilitation Professionals (LARP), a professional organization of rehabilitation counselors. From 1989 to 1991, Ms. Palmer was the editor of Louisiana Rehabilitation, a quarterly newsletter published by LARP and distributed to all LARP members and a few others, a group of approximately 400 persons.
In January 1990, Ms. Palmer’s good friend and colleague, Gene Bohlken, died of brain cancer. Subsequently, she wrote an article entitled “Remembering the Rehabilitation Warrior,” a tribute to Bohlken, which was published in the March 1990 edition of Louisiana Rehabilitation. This article, which is the center of dispute in the ease sub judice, stated:
|2The long battle ended on January 19, 1990 for Gene Bohlken who died, friends said, still fighting ... a true warrior. Gene was never one to give up easily. As a Rehabilitation Specialist with the U.S. Department of Labor, Gene Bohlken fought hard to make the system work, fought hard to make rehabilitation more than a numbers game, fought hard to bring respect to the profession. As if that wasn’t enough, he was burdened with cancer.
It would have been easy for Gene to mark time these past few years, not make waves, and just “get by” on his job. But he choose not only to stay on the job, living out his own philosophy (reported in Louisiana Rehabilitation’s June 1989 issue, which he said, “... given the opportunity, almost anyone can work”), he also chose the path less traveled. Gene could not ignore what he thought were improprieties in rehabilitation, so make waves he did— big ones. Some people said the excitement of the battle itself is what kept him going long after others would have thrown in the towel. Others said he knew time was of the essence and, like others to whom death is a tangible thing, wanted to make a statement, leave his mark.
Whatever his reasons, Gene continued to fight for what he believed was right and confronted ethical violations head-on, knowing that the repercussions could be severe. A counselor whom he decertified in his last few months was eventually reinstated, after the counselor’s attorney harassed Gene at work, at home, and even during his chemotherapy treatments. Appalling actions, but Gene never flinched. He lost that battle, as he eventually lost to cancer. But, he would have noted, chuckling, that he lost a lot of skirmishes in his life. What really mattered was that he spoke out for what he believed. I wonder if I would have had the courage to stand up, alone, as it turned out for Gene, for what was right.
It will be very difficult to replace Gene. His standards were very high ... I would not want to be the counselor who followed that act. Gene touched all of our fives in *759 one way or the other. When I think back on the more than ten years that I knew Gene Bohlken, I am struck by his stamina. He was feisty, outspoken, and had an unwavering belief in rehabilitation. His inner strength endured till the very end. I like to think of Gene as a warrior. I see him with a shiny helmet, not a cap to cover his hair loss. I see him in a knight’s armor, not the slipper shoes he wore because his feet were swollen and brittle. I see him on a powerful horse, not walking around on crutches. In this picture, he is smiling, strong and confident, ready to defeat the next opponent — ineffective counseling, lax ethical standards, poor rehabilitation plans, compromised beliefs. I like that image of Gene — Rehabilitation Warri- or. I think he would like it, too. [Picture omitted.]
|3The plaintiff, Glenn Hebert, a vocational rehabilitation counselor, brought suit against Jennifer Palmer, her company, Jennifer Palmer & Company, and LARP, alleging that he was defamed by the following sentence in the article, namely: “A counselor whom he decertified in his last few months was eventually reinstated, after the counselor’s attorney harassed Gene at work, at home, and even during his chemotherapy treatments.” Hebert insisted that he was the “counselor” referred to in the article. He acknowledged that he was decertified but asserted that he was reinstated on the merits of his case. Hebert argued that this sentence falsely indicated that he was only reinstated because his attorney harassed a dying man.
The case was tried on January 25, 1994, and the trial court rendered judgment on May 20,1994 in favor of Hebert, finding that: (1) while Palmer did not identify the “counselor” in the article, many rehabilitation counselors and lawyers already knew before the article was published that Hebert had encountered some type of problem with his certification; (2) while the words at issue were not defamatory per se, “at least some readers of this article would believe that Hebert hired an attorney to harass a dying man ‘at home, at work, and even during chemotherapy treatments,’ until he could no longer bear it and would have to relent and give up his principles;” (3) the language in the article was “essentially false” because Hebert’s recertification did not occur “after or as a result of, harassment by Mr. Hebert’s attorney;” (4) Palmer acted with “reckless disregard” for whether or not the words were true because she never made an attempt to contact Hebert or his attorney to verify Bohlken’s opinion that he was harassed; and (5) LARP acted with “reckless disregard” because it did not have “in place a system that was rationally calculated to prevent the publication of inappropriate material.” Finally, the trial court awarded Hebert $250.00 in damages, payable by Jennifer Palmer, individually, and LARP, in solido.
Jennifer Palmer appeals from that judgment and asserts that the trial court erred in: (1) imposing liability on her to the extent based upon any words the plaintiff claims defamed him; (2) imposing liability on her based upon any alleged implications the plaintiff claims defamed him; (3) determining that the plaintiff has proven malice, an essential element of the defamation cause of action under Louisiana law; and (4) failing to recognize that plaintiff was a public official or public figure, and that he was required to, but did not, satisfy the constitutional standards which apply in all defamation cases involving such plaintiffs.

\iLAW

To maintain an action in defamation, the plaintiff must prove the following elements: (1) defamatory words; (2) publication; (3) falsity; (4) malice, actual or implied; and (5) resulting injury. Cangelosi v. Schwegmcmn Brothers Giant Super Markets, 390 So.2d 196 (La.1980). Whether a plaintiff has proven the elements of defamation is a factual question to be determined by the trial court or a jury, Fourcade v. City of Gretna, 598 So.2d 415 (La.App. 5 Cir.1992), and an appellate court may not set aside a trial court’s or a jury’s finding of fact in the absence of manifest error, Rosell v. ESCO, 549 So.2d 840 (La.1989).
Palmer essentially argues that Hebert failed to prove that the statement at issue contained defamatory words, was false, and that she acted with malice in publishing *760 the article. Therefore, the threshold issue in a defamation action is whether the complained words are capable of a defamatory meaning. Wattigny v. Lambert, 408 So.2d 1126 (La.App. 3 Cir.), writ denied, 410 So.2d 760 (La.1981).
A statement is defamatory when it tends to expose a person to contempt, hatred, ridicule, or obloquy, causes him to be shunned or avoided, or which has a tendency to deprive him of the benefits of public confidence or injure him in his occupation. Spears v. McCormick & Co., Inc., 520 So.2d 805 (La.App. 3 Cir.1987), writ denied, 522 So.2d 563 (La.1988). The intent and meaning of an alleged defamatory statement must be gathered not only from the words singled out as libelous but from the context as well, and the true meaning must be ascertained from a consideration of all parts of the statement as well as the circumstances of its publication. Sassone v. Elder, 626 So.2d 345 (La.1993). The question of whether a statement is capable of a particular meaning and whether that meaning is defamatory is one for the court. Bussie v. Lowenthal, 535 So.2d 378 (La.1988). The test is the effect the article is fairly calculated to produce, and the impression it would naturally engender in the minds of the average persons among whom it is intended to circulate. Wattigny, supra.
We do not hesitate to find that the statement “[a] counselor whom he decertified in his last few months was eventually reinstated, after the counselor’s attorney harassed Gene at work, at home, and even during chemotherapy treatments” would injure Hebert in his profession. (Emphasis Added.) The record substantiates that, prior to this article being published, it was well known among vocational rehabilitation counselors and lawyers that Hebert had some type of problem with his |5certification at the Office of Workers’ Compensation. Even Palmer admitted that it was “common knowledge” that Hebert had been decertified. Therefore, the average reader of the article would know that the “counselor” referred to in the article was Hebert.
Hebert testified that he “sells” his services to insurance companies and attorneys to do vocational testing, vocational counseling, and career guidance to “try to put people back to work” who have been injured. Often, Hebert gives “expert testimony” in court and at depositions against other vocational rehabilitation counselors. Therefore, Hebert’s credibility is crucial to his success in his profession. The word “after” could import that Hebert was reinstated because his attorney harassed a dying man until he could not take it and would have to relent and give up his principles. Additionally, in the preceding sentence, Ms. Palmer states that Gene Bohlken confronted “ethical violations head-on.” When these two sentences are read together, it appears that an average reader could conclude that: (1) Hebert committed some ethical violations; (2) he was decerti-fied; and (3) he was only reinstated because his lawyer harassed a dying man, not because reinstatement was appropriate. At the least, this statement staggers Hebert’s credibility with a dark cloud of suspicion. In a profession where credibility is essential, this clearly defames Hebert and would likely cause potential clients to refrain from hiring him to avoid a potential problem of credibility in their cases. As the trial court succinctly pointed out in its decision:
It was intended to be a tribute to a great man, Gene Bohlken, ‘the Rehabilitation Warrior.’ Unfortunately, the author used a bad example to demonstrate a great quality. (Emphasis Added.)
Palmer does not dispute that the statement at issue was published, that is, communicated to a third party. Therefore, we will proceed to Palmer’s contention that Hebert failed to prove that the statement was false. After a thorough review of the relevant facts in the record, which are enunciated below, we find that the statement at issue is false because Hebert was not reinstated with the Office of Workers’ Compensation after or as a result of his attorney harassing Gene Bohlken.
On September 11, 1989, Alien Simmons, a vocational rehabilitation counselor, notified Bohlken that Hebert had allegedly engaged in some improper conduct. Based on this information, Bohlken decertified Hebert with *761 the Office of Workers’ Compensation and terminated his contract. Hebert then hired Kim Hoffman, an attorney, to get him reinstated. Hoffman unequivocally testified that during this | ¿representation, she contacted Donnette Glenn, deputy commissioner for the New Orleans office of U.S. Department of Labor, to discuss Hebert’s decertification; and that she drafted “a long letter” to Carol Fleschute, regional director for the Office of Workers’ Compensation in Dallas, Texas, explaining why Hebert’s decertification was improper. Hebert was recertified by Fleschute on October 30, 1989.
Subsequently, Hoffman, on behalf of Hebert, filed a defamation suit against Allen Simmons (the person who made the initial complaint to Bohlken). It is the undisputed testimony of Hoffman that the first time that she came into contact with Bohlken was on November 16, 1989 when she and John Bergstedt, an attorney representing Allen Simmons, had a “conference call” with Bohlken about his giving a deposition in that case. Hoffman and Bergstedt both described the tone of the conversation as “friendly.” Bergstedt indicated that Hoffman subpoenaed Bohlken at his home and office on November 10,1989 to appear for a deposition scheduled on November 17. However, that deposition was cancelled when both attorneys learned that the U.S. Department of Labor, Bohlken’s employer, needed to give its permission. While this permission was being sought, Hoffman again subpoenaed Bohlken on November 22,1989 at his office to appear at a tentatively scheduled deposition on December 8. However, this deposition was can-celled because the Department of Labor refused to allow the attorneys to depose Bohlken. Hoffman clearly stated that she in no way harassed Bohlken at his home, office, or during his chemotherapy treatments. Thus, it is clear that Hoffman contacted Bohlken after Hebert was reinstated, and that Hoffman did not harass Bohlken.
In order to prove malice, Hebert must prove that the statement at issue was published with the knowledge that it was false or with reckless disregard for whether it was true or false. Fourcade, supra. Hebert argues, in essence, that Ms. Palmer acted with “reckless disregard” for the truth because she did not investigate Bohlken’s contention that he was being harassed. Accordingly, the trial court found that Ms. Palmer acted with malice because she did not “confirm” what Bohlken had told her. We agree.
A publisher does not have to investigate what an informant tells her if: (1) the informant was in a position to obtain the information furnished by them; and (2) there was no apparent reason for the publisher to doubt the truthfulness of the information. Spears, supra. Obviously, Bohlken was in the best position to obtain the information that he relayed to Palmer: that he was being harassed by Hebert’s attorney. However, 17we find that there was an apparent reason for Ms. Palmer to doubt the truthfulness of Bohlken’s perception that he was being harassed. The record substantiates that by 1988, Bohlken developed an inoperable brain tumor which affected his thought processes. Ms. Palmer even acknowledged that Bohlken had “brain cancer” and that he was undergoing strenuous chemotherapy treatments at the time he told her about the alleged harassment. Therefore, under these unique circumstances, Ms. Palmer, at the least, should have taken a few minutes to contact Hebert or his attorney to investigate Bohlken’s perception of harassment.
On appeal, Palmer argues that Hebert is a “public official” under New York Times Co. v. Sullivan, 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964), or a “limited purpose public figure” under Gertz v. Robert Welch, Inc., 418 U.S. 323, 94 S.Ct. 2997, 41 L.Ed.2d 789 (1974), and as such, Hebert had to prove by “clear and convincing evidence” that Palmer acted with reckless disregard for whether or not the statement was true or false. The trial court did not make these factual findings; therefore, we will address these issues, de novo, since the record before us is complete.
In Rosenblatt v. Baer, 383 U.S. 75, 85-86, 86 S.Ct. 669, 675-76, 15 L.Ed.2d 597 (1966), the United States Supreme Court, in explaining the concept of a “public official,” stated:
Criticism of government is at the very center of the constitutionally protected area of free discussion. Criticism of those *762 responsible for government operations must be free, lest criticism of government itself be penalized. It is clear, therefore, that the “public official” designation applies at the very least to those among the hierarchy of government employees who have, or appear to the public to have, substantial responsibility for or control over the conduct of governmental affairs.
[[Image here]]
... Where a position in government has such apparent importance that the public has an independent interest in the qualifications and performance of the person who holds it, beyond the general public interest in the qualifications and performance of all government employees, ... the New York Times malice standards apply. (Footnotes omitted.)
[[Image here]]
But a conclusion that the New York Times malice standards apply could not be reached merely because a statement defamatory of some person in government employ catches the public’s interest; ... The employee’s position must be one which would invite public scrutiny and discussion |⅞of the person holding it, entirely apart from the scrutiny and discussion occasioned by the particular charges in controversy. (Emphasis Added.)
In the ease sub judice, Hebert had a contract with the United States Department of Labor to provide vocational rehabilitation to certain disabled individuals for whom the Department had a legal obligation to provide these types of services. The focus of Hebert’s position is narrow and individualized. In no conceivable way does he have “substantial responsibility for or control over the conduct of governmental affairs” as would the president, a congressman, a governor, a state senator, or mayor. Further, Hebert’s contract with the Department to provide vocational rehabilitation services to certain disabled individuals does not invite “independent interest in the qualifications and performance of the person who holds it, beyond the general interest in the qualifications and performance of all governmental employees” as would, for example, a school superintendent, State v. Defley, 395 So.2d 759 (La.1981), or the director of the state employees retirement system, Schaefer v. Lynch, 406 So.2d 185 (La.1981). Finally, Hebert does not occupy a position involving scrutiny and discussion apart from that occasioned by the “charges in the controversy.” While most vocational rehabilitation counselors knew that he had some type of problem with his certification, the scrutiny and discussion concerning his reinstatement did not begin until after Palmer’s article was published. We find no evidence in the record that leads us to believe that Hebert is a public official nor is he a public figure.
An individual who voluntarily injects himself or who is drawn into a particular public controversy and attempts to influence the resolution of the issues involved becomes a limited purpose public figure for those issues. Gertz, supra. In the case sub judice, Hebert did not thrust himself into public controversy to influence others. In fact, he assumed no prominence in any public controversy, except as a result of the defamatory publication. It is well established that “those charged with defamation cannot, by their own conduct, create their own defense by making the claimant a public figure.” Hutchinson v. Proxmire, 443 U.S. 111, 135, 99 S.Ct. 2675, 2688, 61 L.Ed.2d 411 (1979). Thus, we conclude that Palmer’s argument is without merit.
Palmer does not assign as an error the trial court’s finding that Hebert was in fact injured by the statement in her article. Therefore, we do not need to review this issue. Uniform Rules, Courts of Appeal, Rule 1-3. Nevertheless, the record substantiates the trial court’s finding that Hebert was humiliated, embarrassed, and inconvenienced by the continuing need to explain the facts and circumstances | asurrounding his de-certification and subsequent recertification with the Office of Workers’ Compensation.
Thus, we conclude the trial court was not manifestly erroneous in finding that Hebert proved that Ms. Palmer defamed him in the March 1990 edition of the Louisiana Rehabilitation.

*763
CONCLUSION

For the foregoing reasons, the judgment of the trial court is affirmed. Costs of this appeal are assessed against the defendant-appellant, Jennifer Palmer.

AFFIRMED.